(No. 21908.—

R. O. AHLENIUS, Defendant in Error, *vs.* BUNN & HUMPHREYS, INC., Plaintiff in Error.

*Opinion filed October 24, 1934.*

B. L. CATRON, HAL M. STONE, and BRANSON WRIGHT, for plaintiff in error.

BRACKEN, LIVINGSTON & MURPHY, for defendant in error.

Per CURIAM: R. O. Ahlenius, the owner of 150 shares of the common stock of J. F. Humphreys & Co., filed a petition in the circuit court of McLean county against Bunn & Humphreys, Inc., successor by consolidation to the former company and to John W. Bunn & Co., by which he sought the determination of the fair value of his shares of stock and their purchase by the consolidated corporation. The defendant interposed a demurrer to the petition and the demurrer was overruled. Thereafter, it made a motion to strike portions of the petition relating, among other things, to the fair and actual value of certain assets of J. F. Humphreys & Co. transferred to one of its stockholders in exchange for shares of its stock prior to the consummation of the consolidation. The motion was allowed. The cause was tried by the court without the intervention of a jury and a judgment for $12,842.72 and costs was rendered in favor of the petitioner and against the defendant. On an

appeal prosecuted by the defendant, the Appellate Court for the Third District reversed the judgment of the circuit court and, without remanding the cause, on cross-errors assigned by the appellee, the original petitioner, rendered judgment for $20,144 and costs in his favor. A writ of *certiorari* was granted by this court and after a review of the record, the judgment of the Appellate Court was reversed and the cause was remanded to that court with directions either to affirm the judgment, or, if there was error in matter of law requiring its reversal, which error could be corrected on another trial, to remand the cause and order the correction of the error, or if a final judgment should be entered finding the facts different from the trial court, to incorporate in the judgment the ultimate facts so found. (*Ahlenius* v. *Bunn & Humphreys, Inc.* 350 Ill. 46). Pursuant to the mandate of this court, the Appellate Court subsequently amended its opinion and judgment, incorporating findings of fact (1) that Ahlenius was a stockholder of J. F. Humphreys & Co. before and at the time of its consolidation with John W. Bunn & Co.; (2) that he objected to the consolidation; (3) that the fair value of the shares of stock owned by him at the time of the consolidation was $17,470.50; (4) that the two named corporations were consolidated September 21, 1928; (5) that the interest on the principal debt from that day to the date of the rendition of the former judgment amounted to $2673.50 and (6) that the total damages due Ahlenius from Bunn & Humphreys, Inc., at that time were $20,144. The record is again submitted pursuant to a second writ of *certiorari* for a further review.

J. F. Humphreys & Co., a domestic corporation, with its principal office in the city of Bloomington, conducted a wholesale grocery business from January 12, 1891, the day of its organization, until 1928. In June of the latter year, its outstanding capital consisted of 1223 shares of preferred and 4000 shares of common stock, each class having a par

value of $100 per share. The senior stock was preferred as to assets and earnings and dividends at the rate of six per cent annually. It was widely distributed. There were but seven common stockholders. Howard Humphreys, the president, owned 30, Rogers Humphreys, his son, the secretary and treasurer, 3793, Ahlenius, 150, and four other persons, the remaining 27 shares. Ahlenius bought his stock on three different occasions, the initial purchase occurring on October 30, 1918. For approximately ten years beginning November 1, 1918, he was a director, the vice-president and the general manager of the corporation.

John W. Bunn & Co., also a domestic corporation, had likewise been engaged in the wholesale grocery business for many years. Its principal office was located in the city of Springfield. George W. Bunn, Sr., individually and as a trustee of the estate of John W. Bunn, deceased, controlled a substantial majority of its capital stock.

On the first day of June, 1928, Rogers Humphreys and George W. Bunn, Sr., the controlling stockholders of the two corporations, for and on their behalf, executed a preliminary agreement for their consolidation into a new corporation to be named Bunn & Humphreys, Inc. The instrument provided, among other things, that prior to the consolidation each company should sell or dispose of all its assets which were not to be transferred to the successor corporation. These assets were described generally as real estate, doubtful accounts, certain furniture and equipment, and any other assets not specified for acquisition by the new company.

A special meeting of the board of directors of J. F. Humphreys & Co., on June 4, adopted a resolution ratifying the tentative contract. By a second resolution, in which the terms and conditions of the preliminary agreement were set forth, it was declared that the contribution of the company to the capital assets of the consolidated corporation should consist of its inventories, accounts receivable and

notes deemed good, office furniture and fixtures, delivery equipment, insurance, and all money on hand on June 30, 1928, and that their value should be appraised as of the close of business on that day at the lower of their then cost price or market value. To effect the proposed plan, Rogers Humphreys offered to purchase certain parcels of land and doubtful accounts and to pay for them by the surrender of shares of the corporation's common stock. A resolution accepting this offer was adopted. It contained no provision for ascertaining the actual or fair value of either the real estate or the doubtful accounts.

The stockholders, at a special meeting held on June 26, 1928, approved the resolutions adopted by the directors. Ahlenius voted for these resolutions. The president stated that in order to comply with the requirements of a proper certificate to the Secretary of State it would be necessary to determine the exact holdings of the stockholders as a result of the appraisal and inventory required by the resolution relating to the corporation's contribution to the capital assets of the consolidated corporation. A resolution was adopted by which the meeting was adjourned to July 24, 1928, further to consider and act upon the resolution for the consolidation and the certificate to be made to the Secretary of State. On July 24 the meeting was adjourned to the tenth day of August and on that day to September 21, 1928. At the last meeting Rogers Humphreys announced that the inventories had been carefully checked and reduced to their sound values and that the number of shares of stock of the new corporation to be allocated to each stockholder had been determined. He stated that the stock to be surrendered by him to the company in exchange for the assets to be transferred to him had been fixed at 1102 shares. With the single exception of Ahlenius, all the stockholders present voted for the adoption of a resolution approving this transaction. The final resolution for the consolidation was also adopted at this meeting. Ahlenius

voted against the resolution. In explanation of his negative vote, he said that it was not his intention to oppose the consolidation but to preserve his statutory rights. He added that he had given formal notice to and had made demand upon Bunn & Humphreys, Inc., to purchase his shares of stock. An adjourned special meeting of the stockholders of John W. Bunn & Co., held on the same day, adopted a like resolution of consolidation. On October 22, 1928, a certificate of consolidation was issued by the Secretary of State. No notice of the consolidation was mailed to Ahlenius by Bunn & Humphreys, Inc., the acquiring corporation.

The assets transferred and conveyed to Rogers Humphreys were stocks and bonds; real estate not used for corporate purposes; a parcel of land improved by a building known as the Moline building in which the company conducted its business; the machinery and equipment in a refrigerator room located in the basement of that building, and a brick structure described as warehouse "C." Their combined book value, after deducting reserves set up against the two buildings, was $208,352.43. A mortgage indebtedness of $80,000 against part of the real estate reduced the net book value of the assets received by Humphreys to $128,352.43, or $116.47 for each of the 1102 shares he surrendered. Humphreys assumed payment of the mortgage.

A condensed balance sheet prepared from the books of J. F. Humphreys & Co., by its auditor, at the direction of Ahlenius, disclosed the condition of the company on June 30, 1928, before the assets transferred to Rogers Humphreys were eliminated and other items not acceptable to Bunn & Humphreys, Inc., were charged off in contemplation of the impending consolidation. According to this statement, the book value of the assets on June 30 exceeded the liabilities by $588,486.56, and the value of each of the 4000 outstanding shares, after deducting $122,300 for the preferred stock, was $116.54.

Ahlenius, the defendant in error, testified that an inventory of all the assets and property of J. F. Humphreys & Co. was taken as of June 30, 1928, and that they were listed at their fair net values. He was asked whether he knew of his own personal knowledge that their fair cash value as of the day designated, and as shown by the inventory, exceeded the company's obligations and liabilities by $588,486.56. Subject to objection, he answered that this amount was established as of the close of business on June 30. He stated that the corporate assets were valued at the lower of market value or cost price and by eliminating bad accounts and obsolete merchandise. The trial court allowed the defendant in error, subject to the objections of Bunn & Humphreys, Inc., the plaintiff in error, to describe portions of the real estate conveyed to Rogers Humphreys and to state the amounts at which the Moline building and the land upon which it stands were valued on the books of the company as of June 30, 1928. He was asked, based upon the net valuation of the property and assets conveyed to Humphreys, the value of each of the 1102 shares surrendered by him. The plaintiff in error objected on the ground of immateriality and its objection was sustained. Subject to objection, the defendant in error did say that according to the auditor's statement each share of the outstanding common stock was valued at $116.54. On cross-examination, he testified that he had general charge of taking an inventory of the merchandise on hand as of June 30, 1928; that there was no real appraisal of the fixed assets or real estate, including the Moline building, and that they were carried at their book values; that in his opinion there was an increase in the value of the Moline building during the two years preceding the consolidation and that on June 30, 1928, it was worth its book value. On re-direct examination, he was asked to express an opinion, based upon his knowledge of land values and business properties in Bloomington, whether the Moline building

was worth approximately $200,000. The question was objected to as immaterial and the objection was sustained.

Harvey W. McMullen testified that he was employed as the auditor of J. F. Humphreys & Co. continuously from July, 1926, and had charge of its books; that in the fall of 1928 the defendant in error requested a condensed balance sheet and that he supplied him with one based on the book-keeper's record as of June 30, 1928; that the total net worth, $588,486.56, included the assets transferred to Rogers Humphreys and also $202,208.01 representing items such as suspended accounts and good will which were later charged off.

Arthur R. Williams, a licensed accountant, was asked how much, based upon the actual value of the assets conveyed as shown by the books of J. F. Humphreys & Co. and also as shown by the books as of June 30, 1928, Rogers Humphreys received for the shares he surrendered. An objection on the ground of immateriality was sustained. The defendant in error offered to show by Williams that it was $116.47. The witness was then interrogated with respect to the value of the 5223 outstanding shares based upon the total net assets of the company as of June 30, 1928. An objection to this question was likewise sustained. Williams was allowed, however, over objection, to state, in response to another question, that the book value of each common share on June 30 was $116.54.

Rogers Humphreys, called as a witness by the defendant in error, testified that by agreement between the principals the constituent corporations decided upon the particular assets to be purchased by the plaintiff in error and that the assets actually transferred to it were correctly valued. He stated that he did not receive $116.47 in money per share for his stock.

The plaintiff in error introduced a balance sheet or schedule on which the real estate and other assets withdrawn by Humphreys are merely transferred at their

book values from a column designated "book value" to another entitled "Rogers Humphreys." Items aggregating $202,208.01 appear in a column marked "Eliminations for merger." The book value of the common stock, at the close of business on June 30, determined for consolidation purposes and shown by this statement, is $154,277.26. The plaintiff in error also introduced a statement purporting to show the fair value of the stock as of October 22, 1928. By this exhibit, purported liabilities of the company alleged to have been undisclosed theretofore were deducted from the net worth and certain additions of assets were made resulting in an adjusted value, according to the plaintiff in error, of $125,150.22, or $43.18½ for each of the outstanding common shares on the day last named.

Among the items carried on the books as assets but eliminated for the purposes of the consolidation was one of $100,000 for good will. In 1928, J. F. Humphreys & Co. employed approximately one hundred persons and the volume of its business averaged about $2,000,000 annually. The corporation had sustained losses for the three and one-half years prior to July 1, 1928, and had not paid dividends on its common stock during the ten years preceding that date. It had regularly paid, however, the dividends on its preferred stock. Audrey C. Flood, an auditor associated with John W. Bunn & Co. from June 1, 1925, to July 1, 1928, and an officer of the plaintiff in error, testified that there was a recognized method by which accountants established the value of good will, namely, the capitalization of earnings in excess of a fair return on the invested capital over a period of three or five years. He stated that, in his opinion, the good will of J. F. Humphreys & Co. was without value. The defendant in error offered to prove that despite the losses incurred by the company, the value of its good will was substantial. The plaintiff in error objected to this offer of proof and its objection was sustained.

The trial court refused to adopt as a measure of valuation either the value of all the assets on June 30, 1928, or of those transferred to Rogers Humphreys, and decided that the valuation of the shares of stock of the defendant in error should be determined as of October 22, 1928. At the request of the plaintiff in error the court held the following propositions of law: "3. All of the evidence offered by petitioner with respect to the nature or value of the real estate of J. F. Humphreys & Co., that was received on the hearing subject to objection, was incompetent evidence and should be and is excluded. 4. All of the evidence as to the nature or amount of property purchased by Rogers Humphreys from J. F. Humphreys & Co., or the amount paid therefor, or the manner of said payment, in so far as such evidence was received subject to objection, should be and is excluded." To the net worth of the company represented by the assets transferred to the plaintiff in error, as it appeared on the balance sheet used for that purpose, $154,277.26, the trial court added the entire book value of two items which had been eliminated for the purpose of the consolidation, namely, suspended accounts or bad debts aggregating $44,521.22, and a debt of Howard D. Humphreys in the principal sum of $25,000. The company, under the direction of the defendant in error, had set up a reserve of $18,847.88 for doubtful accounts and notes. Although no question of its propriety was raised, the court did not make allowance for this reserve when it added the suspended accounts. Other items such as good will which also had been eliminated were held to be without value. Some minor additions to and deductions from the net worth, not material to this inquiry, were made. In this mode a total valuation of $226,698, or $78.22 for each of the 2898 common shares outstanding on October 22, 1928, was obtained. The value of the shares of the defendant in error, according to this computation, was $11,733. This sum with interest from

October 22, 1928, to the day of judgment amounted to $12,842.72.

Bunn & Humphreys, Inc., the plaintiff in error, contends that there is no competent evidence in the record to sustain the findings of fact that Ahlenius, the defendant in error, was a dissenting stockholder within the contemplation of section 73 of the Corporation act, or that the fair value of his stock at the time of the consolidation was $17,470.50, as found by the Appellate Court. To sustain the judgment of that court, the defendant in error maintains that its findings of fact are supported by competent evidence, and they are binding upon this court.

Section 73 of the Corporation act, as amended in 1921 and in effect prior to July 13, 1933, (Cahill's Stat. 1931, p. 747; Smith's Stat. 1931, p. 756) provides, among other things, that any stockholder objecting to a merger or consolidation with another corporation, shall be obliged to sell and transfer to the acquiring corporation and the latter shall be compelled to purchase his shares, together with all rights and interests thereby represented, including all money, securities or other benefits accruing to the shares as a result of the consolidation, at a price equal to their fair value with interest at the rate of five per cent annually from the day the consolidation is consummated. It is further provided, however, that the fair values shall be ascertained without regard to any depreciation or appreciation owing to the consolidation. In the event that the acquiring corporation fails to pay an objecting stockholder within thirty days following a mailing of notice to him of the consolidation, he is authorized, within sixty days thereafter, to file a petition in the circuit court of the county in which the principal office of the acquiring corporation is located, asking for a finding and determination of the fair value of his shares of stock. The practice and procedure prescribed for determining the fair value of such shares is

the same, so far as practicable, as prevails under the eminent domain laws of the State.

It will be observed that section 73 provides that the practice and procedure for the determination of the fair value of the shares of stock owned by an objecting or dissenting stockholder shall conform, if possible, to that in eminent domain proceedings. Under that procedure objections to the right of a petitioner to condemn or to the jurisdiction of the court are legal objections and should be adjudicated before the cause is presented and heard on its merits. (*Illinois Central Railroad Co.* v. *Roskemmer,* 264 Ill. 103; *Chicago and Milwaukee Electric Railroad Co.* v. *Diver,* 213 id. 26). The plaintiff in error did not, before the trial, interpose objections to the right of the defendant in error to file his petition. By entering upon the trial of the cause on the merits without previously seeking a hearing on the legal objections in conformity with the practice and procedure in eminent domain cases (*Department of Public Works* v. *McBride,* 338 Ill. 347; *Lieberman* v. *Chicago and South Side Rapid Transit Railroad Co.* 141 id. 140; *Ward* v. *Minnesota and Northwestern Railroad Co.* 119 id. 287), the plaintiff in error necessarily waived all its legal objections, including that of the status of the defendant in error as an objecting stockholder. The sole issue remaining for determination in the trial court was, accordingly, the appraisal of the fair value of the shares of stock in controversy.

The plaintiff in error contends that the valuation of the shares of the defendant in error as fixed by the Appellate Court is not supported by any competent evidence because it is predicated solely upon offers of proof excluded by the trial court but accepted by the Appellate Court as conclusive evidence of the facts offered to be proved without affording the plaintiff in error an opportunity to controvert those purported facts. Section 122 of the Practice act (Cahill's Stat. 1931, p. 2189; Smith's Stat. 1931,

p. 2223) provides: "The Supreme Court shall re-examine cases brought to it by appeal or writ of *certiorari* as provided in this act, from the Appellate Courts, as to questions of law only; and in the cases aforesaid, no assignment of error shall be allowed calling in question the determination of the inferior or Appellate Courts upon controverted questions of fact therein." Where the Appellate Court reverses the trial court for error of fact, without remanding the cause, and in its judgment recites the ultimate facts upon which the judgment rests, if no material evidence has been wrongfully excluded, this court will be bound by the findings of fact. In such cases, this court will only look into the record for the purpose of ascertaining whether the law has been correctly applied to the facts as found. (*Schaefer* v. *Washington Safety Deposit Co.* 281 Ill. 43; *Cobe* v. *Bartlett,* 270 id. 61; *Scheevers* v. *Illinois Central Railroad Co.* 235 id. 227; *Chaplin* v. *Illinois Terminal Railroad Co.* 227 id. 166). An exception to the rule that this court, on review of a case at law, is bound as to questions of fact by the finding of the Appellate Court, obtains in those cases where the correctness of the finding becomes a question of law. (*Seiders* v. *Henry,* 347 Ill. 467; *Martin* v. *Central Trust Co.* 327 id. 622). The determination of whether there is any evidence in the record to support the findings of the Appellate Court is itself a question of law which may be inquired into by this court. *Seiders* v. *Henry, supra; Martin* v. *Central Trust Co. supra; Scheevers* v. *Illinois Central Railroad Co.* 235 Ill. 227.

It does not appear that the method of appraisal of the shares of dissenting stockholders has received consideration by this court. In other jurisdictions the question presented has arisen under similar statutes in a relatively small number of cases. The value of shares of corporate stock has been held to mean not merely the market price, if the stock is traded in by the public, but its intrinsic value, to deter-

mine which all the assets and liabilities of the corporation must be ascertained. (*Cole* v. *Wells,* 224 Mass. 504.) The value of the stock of a corporation, it also has been decided, must be determined by the fair market value of the corporate property as an established and going business. (*American Seating Co.* v. *Bullard,* 290 Fed. 896.) Precise rules for determining the value, whatever the descriptive term used, cannot be laid down. (*Matter of Fulton,* 257 N. Y. 487). The very nature of most cases precludes proof of value and damage with the precision of mathematical computation. A situation is presented which calls for the exercise of judgment upon consideration of every relevant evidential fact and circumstance entering into the value of the corporate property and reflecting itself in the worth of corporate stock. (*Jones* v. *Missouri-Edison Electric Co.* 233 Fed. 49). Among the factors which have been considered in analogous cases are earning capacity (*Allied Chemical and Dye Corp.* v. *Steel and Tube Co. of America,* 14 Del. Ch. 64); the investment value of the stock which is largely determined by the rate of dividends, the regularity with which they have been paid, the possibility that they will be increased or diminished, the selling price of stocks of like character, the amount of preferred stock in comparison with the common stock, the size of the accumulated surplus applicable to dividends, the record of the corporation and its prospects for the future (*Matter of Fulton,* 257 N. Y. 487) and good will (*Matter of Seaich,* 170 App. Div. 686, affirmed 219 N. Y. 634). Of these, the good will of a business may be of great value in the probability that old customers will continue their custom and recommend the business to others; and such value is ordinarily the sum which any person would be willing to pay for the opportunity of being able to keep the trade connected with a business that has been carried on with a profit. Conversely, there is no value in the good will of a business which has been a financial failure. (*Linden*

*Bros.* v. *Practical Electricity and Engineering Publishing Co.* 309 Ill. 132; *Dee Co.* v. *Proviso Coal Co.* 290 id. 252). The New York courts, in appraising the stock of non-assenting stockholders, hold that the value of good will can be determined by multiplying the average annual net profits by a given number of years and deducting therefrom interest on the capital invested. (*Matter of Seaich,* 170 App. Div. 686, affirmed 219 N. Y. 634; *Von Au* v. *Magenheimer,* 115 id. 84; 126 App. Div. 257, affirmed 196 N. Y. 510). The determination of the appropriate number of years is not a question of law, but one of fact dependent upon the evidence in each action with respect to the nature and character of the particular business. *Von Au* v. *Magenheimer, supra; Matter of Ball,* 161 App. Div. 79.

Mere book value should not govern in determining the value of the shares of objecting stockholders (*Homer* v. *Crown Cork and Seal Co.* 155 Md. 66), and appraisal values are not necessarily controlling (*Allied Chemical and Dye Corp.* v. *Steel and Tube Co. of America, supra*). The use of book values, especially, to measure the value of corporate shares, owing to the multifarious uses for which they are employed, is generally condemned as unsound. "Remedies of Dissenting Stockholders under Appraisal Statutes," Prof. Norman D. Lattin, 45 Harvard L. R. p. 233; "Dissenting Shareholders: Their Rights to Dividends and the Valuation of Their Shares," Benjamin M. Robinson, 32 Columbia L. R. p. 60; *Homer* v. *Crown Cork and Seal Co. supra; Borg* v. *International Silver Co.* 11 Fed. (2d) 147). The Circuit Court of Appeals for the Second Circuit, in the case last cited, observed: "The suggestion that the book value of the shares is any measure of their actual value is clearly fallacious. It presupposes, first, that book values can be realized on liquidation, which is practically never the case; and, second, that liquidation values are a measure of present values. Everyone knows that the value of shares in a commercial or manufacturing

company depends chiefly on what they will earn, on which balance sheets throw very little light. When all is said, value is nothing more than what people will pay for the shares, given as wide an opportunity for bidders to come in as is reasonably possible."

A substantial part of the corporate property of J. F. Humphreys & Co. was transferred to the controlling stockholder. The trial court held that this transaction was immaterial upon the question of the fair value of the shares in question. The defendant in error, nevertheless, offered some evidence with respect to the value of the real estate conveyed to Humphreys. The court, consistently with the ruling that the portions of the petition relating thereto were immaterial, refused to receive it, and, at the conclusion of the introduction of testimony, excluded all evidence received subject to objection which related to either the property or its value. If it be conceded that the evidence shows the book value of each of the shares exchanged by Humphreys was $116.47, it does not follow that it corresponded with their fair value. The taking of the inventory and the fixing of values for the purpose of effecting the consolidation had no relation whatever to the assets transferred to him. The agreement relating thereto provided that they were to be paid for, not in money, but by an exchange of stock; and an appraisal of the property taken out by him was not required. Proof that the fair and the book values of the assets received by Rogers Humphreys for a part of his stock were the same is wanting. The Appellate Court's finding of fact that the fair value of the stock owned by the defendant in error at the time of the consolidation was $17,470.50 is, therefore, without foundation.

The judgment of the Appellate Court is reversed and the judgment of the circuit court is affirmed.

*Judgment of Appellate Court reversed.*
*Judgment of circuit court affirmed.*