STURTEVANT STEWART *et al.*, Plaintiffs-Appellees, *v.* D. J. STEWART & COMPANY *et al.*, Defendants-Appellants.

Second District (1st Division)   No. 75-180

Opinion filed May 5, 1976.

Robert S. Frederickson, of Reno, Zahm, Folgate, Skolrood, Lindberg & Powell, of Rockford, for appellants.

Patrick H. Sreenan, of Rockford, for appellees.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The defendant D. J. Stewart & Company, an Illinois corporation (hereinafter STEWART), was merged into the defendant D. J. Stewart & Company, a Wisconsin corporation (hereinafter STEWART, WISCONSIN), the wholly owned subsidiary of the Illinois corporation. The plaintiffs, as minority stockholders of the Illinois corporation, sued to determine the fair value of their shares pursuant to section 70 of the Illinois Business Corporation Act (Ill. Rev. Stat. 1973, ch. 32, par. 157.70).[1] The judge, after a bench trial, entered judgment valuing the plaintiffs' shares at $660 per share and awarded interest from the date of the merger. The defendant corporations appeal.

---

[1] The section as material here provides:

"If a shareholder of a corporation which is a party to a merger or consolidation ° ° ° shall file ° ° ° a written objection to such plan of merger ° ° ° the surviving or new corporation shall pay to such shareholder, ° ° ° the fair value thereof.

They contend that the court committed prejudicial error in rulings on evidence and that the judgment is contrary to the manifest weight of the proper evidence.

The defendant STEWART was first established in 1886, incorporated in 1886 or 1890, and continually operated as a two-family retail department store business until 80% of its outstanding shares were sold on February 25, 1972. On that date the shares were purchased by DieMax Corporation, a wholly owned subsidiary of Rockford aacromatics Corporation, at a price of $600 per share. Approximately 21 months later, on November 26, 1973, STEWART was merged into the Wisconsin Corporation. At the time of the merger plaintiffs owned 10% of the stock of STEWART. They objected to the merger and filed a complaint seeking the "fair value" of their shares as of the day prior to the date of the merger pursuant to section 70 of the Business Corporation Act. Defendants, in their answer to the complaint, offered first $183.05 per share and just prior to trial reduced the offer to $105 per share.

Arthur Triebel, a certified public accountant, testified for the plaintiffs. In his opinion the fair value of the shares on the appropriate date was $750 per share. He based his opinion on sales volume, net operating profit, net income before taxes, and book value. He averaged these factors over a five-year period. Based on the increases in these categories for the approximate 21-month period after acquisition and prior to the merger he made a preliminary calculation which, in summary, was illustrated by the following table (Plaintiff's Exhibit No. 4):

| | (1) Jan. 31, 1972 | (2) Price Per Share | (3) (2 ÷ 1) Ratio | (4) Nov. 30, 1973 | (5) (3 × 4) Fair Value |
|---|---|---|---|---|---|
| Five year average: | | | | | |
| (A) Sales | $4,065,138 | $600 | .000148 | $4,214,705 | $ 624 |
| (B) Net Operating Profit | 84,021 | 600 | .00714 | 110,705 | 790 |
| (C) Net Income Before Taxes | 13,686 | 600 | .0438 | 37,840 | 1,657 |
| (D) Book Value | 766 | 600 | .7835 | 784 | 614 |

Fair Value Calculations:

$$\text{Method \#1} \quad .25A + .25B + .25C + .25D = \$920$$
$$\text{Method \#2} \quad .20A + .20B + .10C + .50D = 755$$
$$\text{Method \#3} \quad .33A + .33B + .33D = 675$$
$$\text{Method \#4} \quad .25A + .25B + .50D = 660"$$

* * *

If within such period of 30 days the shareholder and the surviving or new corporation do not so agree, then the dissenting shareholder may * * * file a complaint * * * asking for a finding and determination of the fair value of such shares, and shall be entitled to judgment against the surviving or new corporation for the amount of such fair value as of the day prior to the date on which such vote was taken approving such merger or consolidation, together with interest thereon to the date of such judgment."

The witness began with the arm's length transaction on January 31, 1972, which established the value of $600 per share. He then adjusted this figure by an examination of sales, net operating profits and net profit before taxes by constructing a five-year fiscal period ending on November 30 of 1973, 1972, 1971, 1970 and 1969, respectively. He then averaged the increase in these figures. The book value figure was in accordance with the value carried on the books of the corporation and did not include good will. It appeared from the books of the company that on the date of the acquisition in 1972 the book value was $800 per share which had increased to $830 per share on the date of the merger in 1973. He testified that the $750 figure was "somewhat a medium figure between all four methods." On cross-examination he stated that he did not believe that the value should be reduced because only a 10% minority interest was involved in the merger. He said he gave no weight to dividends because in his experience closely held corporations seldom paid dividends and that in these circumstances they had little practical effect on value.

John D. Emory, an economist associated with a Milwaukee investment firm with experience in appraising closely held corporations, testified for the defendants. He concluded that the fair value of the plaintiffs' stock on the day before the merger was $105 per share. He based his opinion on his consideration of earnings, return on investments, book value, financial conditions, and dividend paying capacity. Marketability and the acquisition sale were also considered. The various factors were compared to similar factors in retailing companies listed on stock exchanges. He stated that he was interested in finding what the "fair market value is for minority stock * * * through the eyes of a hypothetical investor who could be willing to buy the stock in light of other alternatives and available investment opportunities." He did not testify as to the specific weight he gave to the various factors except in relation to the compared companies.

Joseph Wagner, a tax supervisor for the DieMax Company, testified for the defendants. He possessed a law degree, had taken courses in accounting and had experience involving the appraisal of closely held corporations. He concluded that the fair value of the stock in question on the appropriate date was $195 per share. He considered adjusted earnings over a five-year period and also compared them with earnings of department stores listed on stock exchanges which he considered comparable and with other comparable companies where information was publicly available. He compared price-earning ratios of the various companies. He also considered the same factors which Emory had relied upon in making his valuation. Wagner said he gave a weight of 10% to book value, and 10% to the prior acquisition figure of $600.

The court found the fair value of the minority shares to be $660 per share on the applicable date. Judgment was entered against defendants in favor of Sturtevant Stewart, owner of 145 shares for $95,700; and in favor of S. Penfield Stewart, owner of 30 shares for $19,800, plus interest.

Defendants initially contend that the court erred in admitting the price paid for STEWART'S stock at the earlier acquisition date, and in limiting defense testimony tending to show economic and market factors affecting retailing stocks in general during the interim period subsequent to the acquisition but prior to the merger. They also claim that the court erred in allowing testimony regarding a settlement offer made to a third party.

They argue first that the price they paid for STEWART stock in February of 1972 was not material to its value some 21 months later since there was no foundation laid as to the changes in economic conditions during the intervening period. Plaintiffs respond that the defendants waived the question, but that, in any event, there was a full inquiry into the change in economic conditions over the period in question.

In the adverse examination of Dean A. Olson II, an officer of the acquiring corporations, plaintiffs' counsel inquired as to the price paid for the STEWART stock in February of 1972. Defense counsel objected that the valuation that many months before the merger was not material because the conditions that existed then might be totally different than those on November 25, 1973. The court responded that while the ultimate question was the value in November of 1973, the prior value might have some significance and that he would accept the testimony. It is apparent from the record that the $600 figure was not only utilized by plaintiffs' witness, Triebel, who made it a starting point and gave it a weight of from 20 to 33% in his various computations but that it was also considered by the defendants' experts and given at least a 10% weight by one of them.

■■■ Defendants argue that even though they did not object to the admission of Triebel's summary (Plaintiffs' Exhibit No. 4) that they have not waived the issue of the foundation for the previous sale because they objected to testimony as to the previous acquisition price. Whether the issue has been preserved is a substantial question. Nevertheless, the record sustains plaintiffs' claim that full inquiry was permitted relative to the change of economic conditions in the intervening period between the acquisition and the merger. In fact, the real substance of defendants' claim of immateriality as it developed in later examination after the initial objection was that the Dow Jones averages, quotations of other retail department stores listed on the exchanges, and the value of retail stocks of merchandise had gone down during the period between February 25, 1972, and November 23, 1973. The judge indicated, and we believe correctly, that he was more interested in the changes in economic

conditions which could be directly related to STEWART. There was substantial evidence in the record that STEWART'S operating conditions had, in fact, improved after the acquisition in 1972. The earlier transaction, which was conceded by all the witnesses to be one at arm's length, established one factor relevant to fair market value, since it was correlated with the intervening condition of the company as reflected on its audits.

*Pridmore v. Whiting Corp.*, 268 Ill. App. 592 (1932), cited by defendants is inapposite. In *Pridmore*, the plaintiff introduced documentary evidence to show the value of stock as of a date six months prior to the merger. The stock was not listed on an exchange and had no market value established by any prior sale. No intervening audits were introduced nor any other evidence tending to show that the company's condition was substantially the same as to assets, liabilities and net worth on the date of the consummation of the merger. The purchaser was not permitted to introduce evidence to show that the fair value was less than that claimed by the plaintiffs.

Here, there was consideration of the prior sale and of intervening audits. Further, the purchaser was not restricted in introducing contrary evidence. The court could well consider in this case that the evidence of general economic conditions represented by Dow Jones averages in comparison with larger department stores listed on public exchanges was of little aid in determining the fair value of the STEWART Illinois stock.[2]

Defendants have also cited *Ahlenius v. Bunn & Humphreys, Inc.*, 358 Ill. 155 (1934), for the proposition that previous sales of closely held stock have no probative value in determining the market price. However, we find nothing in the opinion which requires the conclusion that a market price established by an arm's length transaction has been eliminated as a factor in an appraisal of fair value. To the contrary, the Supreme Court in *Ahlenius* concludes that "every relevant evidential fact and circumstance entering into the value of the corporate property and reflecting itself in the worth of corporate stock" may be considered. 358 Ill. 155, 168.

Defendants next argue that the court erred in admitting over objection a settlement offer made by DieMax Corporation to one T. D. Woolsey III, an officer of and owner of 10% of the stock in the STEWART company, for $481.71 per share. Defendants contend that the offer was made in connection with a settlement of a lawsuit and therefore was inadmissible. They also claim that they were not permitted to fully explain the nature of the suit which gave rise to the settlement offer.

■■ One of defendants' officers, Dean A. Olson II, called as an adverse witness was asked by plaintiffs' counsel if there were any offers made to

---

[2] There was evidence that the drop in the Dow Jones averages from February 25, 1972, to November 30, 1973, was a little more than 10%.

any of the shareholders after the February 1972 acquisition and before the November 1973 merger. He said that there were not. Plaintiffs' counsel then offered the document purporting to be the offer to purchase Woolsey's share contingent on his resignation as an officer and other conditions. The witness testified that although the document did not show this it was in connection with a pending suit which the Company had offered to settle. This colloquy followed:

> "[Defendants' Counsel]: Okay, just a general objection to that document as not relevant, not material, it hasn't been established that it was ever an offer to Mr. Woolsey and the witness testified that it bears on another suit.
>
> The Court: Well, at this point, I will overrule the objection and the testimony may stand."

On further examination of Mr. Olson by defendants' counsel the witness was permitted to testify over plaintiffs' counsel's objection that the document was prepared as a result of a lawsuit pending against STEWART. It was only when defendants' counsel sought to inquire as to the particular nature of the lawsuit that the court sustained plaintiffs' objection. At the conclusion of the plaintiffs' case in chief the document reflecting the offer was presented with the other exhibits and admitted without objection. The claim that defendants' counsel was effectively prevented from showing that the offer was an offer of settlement and that he was thereby prejudiced is not supported by the record.

■■ It is undisputed that offers of settlement as such are not admissible into evidence. (See, e.g., *Steiner v. Rig-A-Jig Toy Co*, 10 Ill. App. 2d 410, 421 (1956).) However, there is no evidence in the record that plaintiffs' expert witness considered the offer or that the court in any way relied upon it in reaching its conclusion as to the fair value of the stock. It should also be noted that Olson also testified without objection to the sales of small blocks of stock in the corporation within a year and a half before the acquisition, by relatives of the principal stockholders for $550 a share. There is likewise no evidence that these actual sales between family members were any part of the valuation process.

Defendants also argue that the judgment was contrary to the manifest weight of the evidence. Principally they claim that the court used improper criteria in finding Triebel's valuation testimony more credible than that of defendants' experts.

Defendants rely largely on *Ahlenius v. Bunn & Humphreys, Inc.*, 358 Ill. 155 (1934), as setting forth factors of earning capacity, including dividends, investment value of stock, the selling price of stocks of like character, the records and prospects of a corporation, and goodwill, in determining fair value. They contend that these standards were followed by defendants' experts but not by plaintiffs' expert Triebel whose valuation wrongly placed the greatest emphasis on book value.

Defendants also suggest that most authorities do not rely on book value but rather consider three basic factors in valuing the stock of dissenting stockholders to a merger: market value, net asset value and earning value (also referred to as investment value). They cite Squires, *The Dissenting Shareholders' Appraisal Remedy Under the Illinois Business Corporation Act*, 53 Ill. B. J. 482 (1965); Note, *Valuation of Dissenter's Stock Under Appraisal Statutes*, 79 Harv. L. Rev. 1453 (1966); Annot., *Valuation of Stock of Dissenting Stockholders in Case of Consolidation or Merger of Corporation, Sale of its Assets, or the Like*, 48 A. L. R. 3d 430 (1973).

■■ The Illinois Supreme Court in *Ahlenius* does not, however, set forth absolute standards for valuing dissenting stockholders' stock upon a merger as defendants suggest. The discussion of the various standards which may apply is preceded by the specific warning by the court that "Precise rules for determining the value * * * cannot be laid down," and that "A situation is presented which calls for the exercise of judgment upon consideration of every relevant evidential fact and circumstance entering into the value of the corporate property and reflecting itself in the worth of the corporate stock." (358 Ill. 155, 168.) We do not conclude that *Ahlenius* absolutely precludes any consideration of book value. The court states, in effect, that "mere" book value should not govern when it does not correspond to the fair value of the shares. (See 358 Ill. 155, 170.) It should also be noted that the court was speaking of the book value of a company about to go out of business and which had sustained losses for 3½ prior years. And although the transaction was essentially a sale of assets the trial court considered only the book value which included the very suspect item of $100,000 for good will.

The propriety of taking book value into consideration as one factor to be weighed has been recognized in the authorities. See cases collected in Annot., 48 A. L. R. 3d 430, 476, §12(a) (1973).

Here defendants' own witnesses testified that the book value at the merger date was $804 per share. No evidence was offered that would tend to show that the book value was greater than the value of the physical assets of the corporation. Book value did not include any intangible item such as good will. Moreover, the trial court obviously did not solely rely on the value of the assets shown on the books since it reached a valuation which was $145 per share less than the book value. The court weighed additional factors which included a market price established by a prior sale, sales, net operating profits, and net income averaged over a substantial period of time both prior to and subsequent to the acquisition.

■■ Valuation of an interest in a close corporation is "not an exact science, but involves many subjective and complex determinations." (See

O'Neill, Oppression of Minority Shareholders (Callaghan 1975).)[3] In a somewhat related area it should be noted that the Internal Revenue Service recognizes that no general formula is established but that where market quotations are not available all financial data as well as all relevant factors must be considered in reaching the fair value of stock for estate tax and gift tax purposes. The following factors are suggested in IRS guidelines in Bulletin 59-60 as a general approach:

"(a) The nature of the business and the history of the enterprise from its inception.

(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.

(e) The dividend-paying capacity.

(f) Whether or not the enterprise has goodwill or other intangible value.

(g) Sales of the stock and the size of the block of stock to be valued.

(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter." (See 1959 CCH, par. 6354, at 61,491.)

The respective weight to be given the various valuation factors was particularly a matter for the trial judge under the circumstances. See 79 Harv. L. Rev. 1453, 1468-71 (1966); 53 Ill. B. J. 482, 493-94 (1965). *Cf. Flynn v. Zimmerman*, 23 Ill. App. 2d 467, 478 (1960).

From our review of the record we conclude that the judgment was not against the manifest weight of the evidence. We therefore affirm the judgment of the trial court.

Affirmed.

GUILD, P. J., and HALLETT, J., concur.

---

[3] O'Neill offers the footnote:

"The difficulty in properly establishing the value of an interest in a close corporation lies in the complexity and subjective nature of any valuation process. As Dewing has said: 'Value is subjective; it is based on individual human experience. Hence, when the individual tries to find an objective standard or criterion for his own personal values, he is confronted with endless confusion ° ° °. In the end the test of value is pragmatic—where does the judgment of most men meet? It is the composite of many judgments, not the reaching for an illusory fixed and invarying [*sic*] basis of value on which the judgment of all men should agree.' Dewing, The Financial Policy of Corporations 277 (5th Ed 1953).

Every valuation presents a unique problem, and no set formulae exist to be mechanically applied. 'When the problem of evaluating a going business arises, there are few real landmarks of comparison. Almost every element involved in the process is a matter of judgment or, if you prefer, guess-work. Every agreement is the result of negotiation and compromise, particularly on price.' Choka, Buying, Selling & Merging Businesses 51 (3rd Ed 1969)."