INDEPENDENCE TUBE CORPORATION, Petitioner-Appellee, v. AARON LEVINE, as Trustee for Philip Yontez, *et al.*, Respondent-Appellant.

First District (3rd Division)   No. 87—3640

Opinion filed December 28, 1988.—Modified on denial of rehearing March 15, 1989.

Edwin H. Conger and Edward Eshoo, Jr., both of Chicago (Tenney & Bentley, of counsel), for appellant.

Bell, Boyd & Lloyd, of Chicago (John P. Scotellaro and Karen A. Suizzo, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, Independence Tube Corporation, filed a petition in the trial court to determine the value of 100 Class A shares of its stock held by the respondent, Aaron Levine, as trustee for Philip, Christopher, Heather, and Steven Yontez. After a bench trial, the trial court entered an order assessing the fair value of Independence's Class A shares at $550 per share and awarding judgment interest at the rate of 6% from April 1986. The trial court denied Levine's request for expenses and costs incurred in connection with the proceeding. Levine appeals, contending that the trial court erred in discounting the fair value of Independence's shares; the trial court's valuation of Independence's shares was against the manifest weight of the evidence; and that the trial court erred in denying Levine the expenses of his appraiser and attorney.

Independence is a closely held Illinois corporation engaged in the manufacture of welded steel tubing. Prior to March 20, 1986, it had issued and had outstanding 14,479 shares of Class A stock and 318,600 shares of Class B stock. On March 20, 1986, Independence sent its shareholders a notice of a shareholders' meeting to be held on April 10, 1986. The notice recited that the purpose of the meeting was to vote on a proposed amendment to Independence's articles of incorporation. The amendment would enable the company to make a subchapter S election by making Class A and Class B shares equal in economic respects.

Independence included with the notice an offer to purchase its Class A shares for $500 per share and its Class B shares for $25 per share. David Grohne, Independence's president, testified that the offer was made both to reduce the number of shareholders to 35 in order to qualify for subchapter S status and to allow those shareholders who wished to sell their closely held and nontraded stock an opportunity to do so. Grohne stated that the offer price for both classes of stock was determined by Independence's three directors. This determination involved a review of Independence's audited financial statements, bank appraisals for the preceding three years, two valuations acceptable to the Internal Revenue Service, recent sales of its stock, and each director's personal knowledge of Independence and its past

performance. The goal was to set a fair price, high enough to encourage sufficient tenders so that Independence could qualify for subchapter S status, but not so high as to shortchange those who wished to remain shareholders. The three directors each determined a range of acceptable values. They agreed that $500 per share, common to each of their opinions of value, was a fair price to offer.

On April 9, 1986, Levine formally elected to dissent from the proposed amendment pursuant to sections 11.65(a)(3)(i) and 11.70 of the Illinois Business Corporation Act of 1983 (Ill. Rev. Stat. 1985, ch. 32, par. 1.01 *et seq.*), and demanded payment for the value of the 500 Class A shares which he held as trustee. On April 10, 1986, the shareholders approved the proposed amendment by the requisite vote of holders of both classes of shares. On May 14, 1986, Independence purchased 8,925 Class A shares and 31,400 Class B shares. Among those tendered and purchased were 400 of the 500 Class A shares held by Levine. On May 20, 1986, Independence filed the amendment to the articles of incorporation with the Illinois Secretary of State.

On May 21, 1986, Independence notified Levine in writing that, in its opinion, the value of the 100 Class A shares held by him was $500 per share. Independence committed to deliver a check for $50,000 upon receipt of the certificate for Levine's shares. Levine informed Independence that, in his opinion, the shares were worth $774.51 per share and accordingly demanded payment of an additional $27,451. Independence responded that it intended to file a petition in the circuit court to determine the value of the shares as it appeared unlikely that Levine and Independence would reach an agreement as to value. At that time, Independence tendered its check in the sum of $50,000. On June 30, 1986, Independence filed a petition seeking an appraisal of Levine's 100 Class A shares.

At trial, each side presented testimony as to the value of Levine's shares. Independence offered the testimony of Robert Schweihs, the national director of the valuation and appraisal services at Touche Ross. Schweihs determined that the value of a Class A share was $500. Schweihs valued the shares as of May 20, 1986, the effective date of the amendment to the articles of incorporation.

Schweihs testified that he began his valuation by conducting a background investigation of Independence. He toured the facility, examined financial statements for the preceding five years, and reviewed information on shipments, price lists, inventory levels, customer profiles, strength of Independence's markets, growth prospects, prospective budgets, expansion plans, business plans, and strategic plans. Schweihs then applied four valuation methods to ar-

rive at the following range of values: (1) discounted net cash flow—$546 per share; (2) asset accumulation—$509 per share; (3) market comparable—$500 per share; and (4) capital market—$453 per share. Under each method, Schweihs applied a 20% discount factor for lack of market. Schweihs arrived at his $500 valuation by weighting the four approaches, giving the most weight to that approach which best reflected real life transactions, the market comparable approach. The market comparable approach evaluates other sales of the same or similar property. Schweihs believed that this case was well suited to the market comparable approach as there were other transactions, including contemporaneous ones, involving Class A shares of Independence.

Edward M. Murray, Jr., a vice-president of the Continental Bank of Illinois, also testified for Independence. In the preceding three years he had conducted valuations of Independence's Class A stock and found values as follows: 1983—$539 per share; 1984—$410 per share; and 1985—$540 per share. These values were established after a review of Independence's audited financial statements and income tax returns for the preceding five years, a tour of the facility, an interview of management, and the gathering of other information.

Jon Paulsen, the midwest regional director of appraisal services for Arthur Young & Co., testified for Levine. Paulsen used two approaches to value Independence's stock, the market comparable approach and the discounted cash flow approach. Paulsen valued the stock as of March 20, 1986. Under the market comparable approach, Paulsen arrived at a value of $1,080 per share; under the discounted cash flow approach, Paulsen arrived at a value of $1,226 per share. Paulsen opined that the value of Independence's Class A shares as of March 20, 1986, was $1,000 per share. Paulsen later valued the shares as of May 20, 1986, and determined a value of $1,405. Paulsen examined various factors in arriving at his valuations, including adjusted earnings per share, various financial statistics, cash flow, projected revenue growth as well as historical growth patterns, projected expenses, and estimated taxes. He testified that in his calculations, he applied a discount for lack of market. Paulsen did not apply a discount for the minority posture of the shares because each of the approaches which he used assumes a minority interest.

The trial court concluded the value of Independence's Class A shares as of March 20, 1986, was $550 per share. The trial court arrived at this value by considering the factors set forth in *Stewart v. D.J. Stewart & Co.* (1976), 37 Ill. App. 3d 848, 346 N.E.2d 475, as well as the factors set forth in Internal Revenue Service bulletins. The trial court specifically named the following factors: nature and

history of the business, general economic outlook and the outlook of the specific industry, book value of the stock, financial condition of the business, earning capacity, dividend-paying capacity, value of Independence's goodwill and other intangibles, sales of stock, size of the block of stock to be valued, and market price of stock of corporations engaged in like businesses. The trial court determined that its valuation did not represent a material difference from the $500-per-share offer by Independence and accordingly denied Levine's request to assess expenses of the proceeding against Independence. The trial court awarded interest at 6%.

Levine contends that the trial court improperly discounted the fair value of the dissenting shares to reflect that they represented a minority interest and that they lacked marketability. Levine also contends that the trial court's valuation of Independence's shares at $550 per share was against the manifest weight of the evidence. We do not agree.

■■ ■ Section 11.70(e) of the Business Corporation Act provides that a corporation may file a petition requesting the court to determine the "fair value" of shares of stock. (Ill. Rev. Stat. 1985, ch. 32, par. 11.70(e).) The statute does not define the term "fair value" nor does the statute provide any criteria for determining "fair value." Moreover, our courts have noted that there are no precise rules for determining the value of dissenter's shares. Rather, our courts have held that stock valuation calls for the exercise of judgment after consideration of all relevant factors. (*Ahlenius v. Bunn & Humphreys, Inc.* (1934), 358 Ill. 155, 192 N.E. 824; *Stewart v. D.J. Stewart & Co.* (1976), 37 Ill. App. 3d 848, 346 N.E.2d 475.) The factors which may be considered in valuing stock include investment value, dividend history, projected dividend policy, selling prices of stock of like character, ratio of preferred stock to common stock, size of accumulated surplus applicable to dividends, record of the corporation and its prospects for the future, goodwill, book value of shares, and Internal Revenue Service valuation guidelines. (*Ahlenius v. Bunn & Humphreys, Inc.* (1934), 358 Ill. 155, 192 N.E. 824; *Stewart v. D.J. Stewart & Co.* (1976), 37 Ill. App. 3d 848, 346 N.E.2d 475. The weight to be given the various valuation factors is a matter for the trial judge under the circumstances. *Stewart v. D.J. Stewart & Co.* (1976), 37 Ill. App. 3d 848, 346 N.E.2d 475.

The trial court indicated that it had examined these factors in determining its valuation figure. The trial court heard the testimony of Independence's president, who indicated that in the years preceding the amendment to the articles of incorporation Independence had paid

only modest dividends, approximately 10% of its earnings. Further, the trial court heard extensive testimony from two appraisers for Independence and one appraiser for Levine. Each appraiser explained the valuation approaches he used. The trial court also heard testimony that Independence was experiencing increased foreign competition, that there was excess capacity in the industry, and that the growth prospects were not favorable. Finally, the trial court reviewed the record of Class A stock sales made during the preceding years: (1) in October 1984, 500 Class A shares were sold for $400 per share; (2) in April 1985, 36 Class A shares were sold for $440 per share; (3) in December 1985, 15 Class A shares were sold for $440 per share; and (4) in May 1986, pursuant to the offer to purchase, 8,925 Class A shares held by 43 shareholders were sold for $500 per share.

■■ We believe that the trial court had adequate information upon which to base its conclusion that neither the valuation of Levine's appraiser nor that of Independence's appraiser was completely accurate. The trial court's valuation of $550 per share properly reflects the consideration of Independence's modest dividend policy, cyclical revenue performance, and plans for expansion. Moreover, the valuation reflects the fact that Independence conducts its business in a market with increasing foreign competition and unfavorable growth potential. Finally, the trial court's valuation is consistent with historical sales figures.

■■ Levine complains that the trial court improperly applied both a minority discount and an illiquidity discount in arriving at its valuation figure. Although our courts never have addressed the propriety of such discounts in the context of the Act's "fair value" dissenter's provision, we find persuasive the fact that other States which have similar provisions do use such discounts when appropriate. These States recommend valuation by three methods—market value, investment value, and net asset value. (See *Atlantic States Construction, Inc. v. Beavers* (1984), 169 Ga. App. 584, 314 S.E.2d 245; *Ford v. Courier-Journal Job Printing Co.* (Ky. App. 1982), 639 S.W.2d 553; *Blake v. Blake Agency, Inc.* (1985), 107 A.D.2d 139, 486 N.Y.S.2d 341.) These cases caution, however, that the trial court must consider any factor which bears on the stock's intrinsic worth. (*Atlantic States Construction, Inc. v. Beavers* (1984), 169 Ga. App. 584, 314 S.E.2d 245.) Thus it may be appropriate for the trial court to consider a minority interest factor or a lack of marketability factor. There may be situations in which the minority or the illiquid nature of the stock diminishes its value. In such instances, these factors should be considered in determining fair value. *Atlantic States Construction, Inc. v.*

*Beavers* (1984), 169 Ga. App. 584, 314 S.E.2d 245.

●5 The trial court here indicated that it had considered the size of the block of stock being sold when reaching its valuation. Further, the trial court heard various witnesses testify as to the illiquid nature of the shares. Significantly, during the trial, both sides' appraisers indicated they considered these factors in arriving at their valuation figures. Independence's appraiser testified that he evaluated the stock as a minority positioned asset, but that he specifically discounted for the minority posture of the stock only under the evaluation approach which did not automatically account for that posture. He further testified that he applied a 20% illiquidity factor in his calculations. Levine's appraiser testified that in his calculations he also applied a 20% illiquidity factor. He testified further that both approaches which he used "assume a minority interest." Thus Levine's appraiser used the two factors which Levine now contends are improper. We believe that the trial court properly considered both the minority factor and the illiquidity factor.

Levine next contends that the court erred in refusing to assess against Independence the costs of the reasonable compensation and expenses of the appraiser employed by Levine and in refusing to assess against Independence the fees and expenses of Levine's counsel. Levine maintains that the Act mandates the taxation of costs and expenses of the parties' appraisers and experts in all appraisal proceedings, and permits the taxation of attorney's fees and expenses when the court determines that fair value materially exceeds the corporation's offer. We do not agree with Levine's interpretation of the statute.

■ Section 11.70(h) of the Business Corporation Act governs the allocation of costs in this case. It provides as follows:

"The court, in an appraisal proceeding commenced under subsection (e), shall determine all costs of the proceeding, including the reasonable compensation and expenses of the appraisers, if any, and experts employed by any party, but shall exclude the fees and expenses of counsel for any party. If the fair value of the shares as determined by the court materially exceeds the amount which the corporation offered to pay for those shares, or if no offer was made, then all or any part of such expenses may be assessed against the corporation. Except as otherwise provided in this Section, the practice, procedure, judgment and costs shall be governed by the Code of Civil Procedure." (Ill. Rev. Stat. 1985, ch. 32, par. 11.70(h).)

It is well established that statutory language is to be given its ordi-

nary meaning and, in enforcing statutory provisions, courts are bound by the clear and unambiguous language of the statute itself. (*Mack v. Seaman* (1983), 113 Ill. App. 3d 151, 446 N.E.2d 1217.) Here, the plain language of the statute directs the court to determine all costs and expenses of the proceeding, exclusive of attorney fees and expenses. The statute then provides that the court may assess these expenses against the corporation if the court-determined valuation materially exceeds that offered by the company. Thus, we believe the Act does not mandate the taxation of any costs. Rather, the Act permits the taxation of appraiser and expert costs and expenses, exclusive of attorney fees and expenses, if the court determines that fair value materially exceeds the corporation's offer. The statute, however, does not define the parameters of materiality.

■ The trial court determined that its valuation, which exceeded the price offered by $50 per share, did not materially exceed the price per share offered by Independence. The trial court's valuation represents a 10% increase over the price offered. Levine is unable to cite, and we are unable to find, any case in which a 10% difference was found to be a material valuation increase. In the absence of statutory language or case law to the contrary, we cannot find erroneous the trial court's ruling that its valuation did not materially exceed the offered price. Because the court's valuation did not materially exceed the offered price, the trial court properly refused to charge Independence with the costs and expenses of the appraiser employed by Levine.

■ In view of our holding as to the propriety of the court's ruling that its valuation did not materially exceed the price per share offered by Independence, we need not reach the issue as to Levine's right to be reimbursed by Independence for his attorney fees. We note, however, that, as previously mentioned, the Act does not provide for the inclusion of attorney fees and expenses. Rather, it specifically excludes attorney fees and costs. (Ill. Rev. Stat. 1985, ch. 32, par. 11.70.) In light of such exclusionary language, we will not interpret the statute otherwise.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

FREEMAN, P.J., and RIZZI, J., concur.