RANDALL T. JAHN *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. LARRY KINDERMAN *et al.*, Defendants-Appellees and Cross-Appellants.

First District (1st Division)    No. 1—02—2335

Opinion filed June 7, 2004.—Rehearing denied July 21, 2004.—Modified opinion filed July 26, 2004.

16

Freeborn & Peters, of Chicago (William N. Howard, Fred Foreman, and Robert J. Hall, of counsel), for appellants.

Sonnenschein, Nath & Rosenthal (Gerald E. Fradin, of counsel), Fagel & Haber (Richard H. Chapman, of counsel), and McDermott, Will & Emery (Steven P. Handler, Joshua T. Buchman, and Amy G. Doehring, of counsel), all of Chicago, for appellees.

JUSTICE McNULTY delivered the opinion of the court:
Under the Business Corporation Act, frozen-out minority share-

holders in closely held corporations may seek dissolution of the entity, and majority shareholders may avoid this result via a buyout of the minority at a "fair value" to be determined by the circuit court if the sides are unable to reach an agreement on the terms of sale. The instant matter results from such a buyout, and both the selling minority and the purchasing majority appeal: the sellers claim that they were entitled to prejudgment and postjudgment interest on the purchase price and that they should still be entitled to pursue claims of breach of fiduciary duty against the corporation's directors; the purchasers claim that the trial court's "fair value" determination improperly failed to include a discount reflecting the lack of marketability of the minority's shares. We reverse the trial court's denial of postjudgment interest and otherwise affirm its judgment.

## BACKGROUND

Defendant Chicago Metallic Corporation (CMC) was purchased by Reinhardt G. Jahn in 1938, and he subsequently passed ownership and operation of the company to his three sons, Loren A. Jahn, Martin D. Jahn, and Reinhardt H. Jahn. The three shared ownership and decision-making equally, but disputes developed after their offspring entered the company's employment and shareholder ranks. Martin D. Jahn and four other members of his family filed a complaint seeking the remedies provided to shareholders of nonpublic corporations by the Business Corporation Act of 1983 (Act) (805 ILCS 5/12.56 (West 1996)), alleging that the families of Loren and Reinhardt Jahn, along with CMC's president and chief executive officer, defendant Larry Kinderman, and Gerald Lahey, the company's other nonfamily, nonowner member of the board of directors, had committed various acts which constituted oppression and "freeze-out" of the plaintiffs, and which also constituted corporate waste and a breach of fiduciary duty.

The Act provides that in the event of a petition for relief, the corporation or one or more of its shareholders may elect to purchase all of the shares of the petitioning minority, and that the court is to determine the fair value of the shares and other terms of purchase if the parties are unable to agree on those parameters. 805 ILCS 5/12.56(f)(6) (West 1996). In the instant case, the majority offered to purchase the interest of the minority, which amounted to approximately one-third of the shares of CMC, for $28,730,102. The minority shareholders did not agree to this figure, and the trial court, while issuing a stay of other matters raised by the plaintiffs' petition, conducted a 20-day trial on the valuation of the plaintiffs' shares. In the course of the trial, the defendants frequently objected to the

plaintiffs' attempts to present evidence of the various actions alleged to be oppressive and wasteful, but the court ultimately determined that culpable conduct by the defendants could have unfairly depressed the value of the plaintiffs' shares, and that evidence of oppression and waste was thus relevant to the valuation question. After trial, the court issued a written memorandum of its findings which concluded in a determination that the conduct of the defendants did not constitute oppression or waste, and that the fair value of the plaintiffs' shares was $52,485,000.

Following the court's valuation order, the parties attempted to confirm that that order compelled the plaintiffs to relinquish their shares in exchange for the defendants' payment of the valuation price; the parties sought the court's clarification that the exchange, since it came pursuant to court order, did not constitute a waiver of the right to appeal. In the course of discussion of the matter, the court, *sua sponte*, raised the issue of interest for the first time; it advised the parties that it would not award prejudgment interest to the plaintiffs in the absence of evidence that the defendants were "not proceeding diligently to close this transaction." Asked about the scope of that ruling, the court replied, "I mean postjudgment interest and prejudgment interest."

The plaintiffs then sought the court's modification, clarification and reconsideration of its orders regarding valuation and interest. On the valuation issue, they suggested that the court may have arrived at an unduly low price for their shares on the basis of an improper interpretation of the valuation analysis of the economic experts. The court rejected this argument, and the plaintiffs do not seek our review of that ruling. The plaintiffs also claimed that the remedy of prejudgment interest calculated from the date before their filing of the action was equitably justified by various acts of the defendants: the alleged corporate freeze-out, a lowball purchase price offer, and bad-faith price negotiations. The plaintiffs also sought postjudgment interest from the date of the court's order. At the same time, the defendants moved to dismiss the plaintiffs' claim for breach of fiduciary duty, which had been stayed pending the court's adjudication of the valuation issue.

The trial court denied the plaintiffs' request for prejudgment interest: "With regard to prejudgment interest there was no liquidated or easily ascertainable amount that the [defendants] could have paid that would have resolved this litigation or this claim \*\*\*. So with regard to prejudgment interest I don't think that there is any issue whatsoever. Motion for that is denied." The court commented that the plaintiffs were not entitled to attorney fees, and then remarked, "I believe that resolves the motion—the first motion that you've argued \*\*\*." Counsel

for the plaintiffs interjected, "I think there was just one more regarding post-judgment, your Honor," and the court responded, "I don't think you're entitled to anything at all."

The court then turned to the defendants' motion to dismiss count III of the plaintiffs' petition, the breach of fiduciary duty claim. Proceedings on that claim had been stayed pending the valuation of the plaintiffs' shares, and the plaintiffs argued that the stay had prevented them from discovery and the presentation of evidence regarding that claim. The court was unpersuaded by this argument:

"I'm going to grant the motion to dismiss. The value that the Plaintiffs received on their shares involved the consideration of any reduction in value to those shares. It was a consequence of the alleged acts, wrongful acts of oppression which are exactly the same acts that are alleged in support of the breach of fiduciary duty claims.

\*\*\*

And [plaintiffs' counsel] is correct, I did attempt to limit the scope of this trial to issues that related solely to value.

And indeed when Mr. Riley, Plaintiff's experts, [sic] testified, he testified as to what he considered on the question of value. But [plaintiff's counsel] was persistent and effective and he convinced me that beyond the value attributed to the shares by Mr. Riley there was a value that was lost as a consequence of acts of oppression. And we spent days listening to testimony brought forward by the Plaintiffs regarding those specific acts of oppression which again mirror exactly what's asserted in Count 3.

My findings in my opinion as defense counsel has argued addresses each of those allegations specifically \*\*\*. And I found both the evidence as to oppression and as to value or devaluation totally unpersuasive.

Having found that the very allegations that are urged in support of Count 3 did not give rise to any form of oppression which clearly a breach of fiduciary obligation would I can't do anything but say that the conclusion that I reached it wasn't necessarily an inevitable outcome of the trial with regard to valuation that Count 3's trial—that a separate trial on Count 3 would be precluded. That consequence is an artifact of Plaintiff bringing those very issues into their question on valuation which required me to determine whether or not they constituted any form of oppression.

Having said that I believe that any further trial with regard to these issues is precluded.

Accordingly the motion to dismiss Count 3 is granted. And the motion to transfer Count 3 to the law division is denied."

## DISCUSSION
### I. Plaintiffs' Claims For Prejudgment Interest

On appeal, the plaintiffs argue that the trial court erred in failing to include in its valuation order an award of prejudgment interest. They claim that the amount owed to them, calculated by accruing simple interest at the prime rate since the valuation date, is $13,482,688. They acknowledge that the Act, in allowing such awards to be made by the court "if appropriate," and in amounts "determined by the court to be equitable," has delegated adjudication of the issue to the discretion of the trial court. 805 ILCS 5/12.56(e)(iii) (West 1996). The plaintiffs further acknowledge that no reported Illinois precedent arising from a court's determination of a minority buyout price under section 12.56 of the Act has determined that the failure to award prejudgment interest was an abuse of discretion. In the absence of such precedent, the plaintiffs suggest that decisions interpreting arguably similar statutes in Illinois and other jurisdictions may be instructive in the identification of a basis for an award of prejudgment interest. We find the offered cases to be of little value in deciding the interest issue presented here.

In *Weigel Broadcasting Co. v. Smith*, 289 Ill. App. 3d 602 (1996), this court adjudicated the buyout of dissenters in a public corporation who were forced out of their ownership stake in a reverse stock split to which they objected. In that case, the minority owners were ejected from the company's ownership ranks and given compensation for their shares which was subsequently determined by the trial court to be unfairly low; this court noted that the section of the Act applicable to such instances, section 11.70, "provides that a dissenter is entitled to interest if the fair value of his shares, as determined by the court, exceeds the amount paid by the corporation." *Weigel*, 289 Ill. App. 3d at 611. Unlike *Weigel*, the instant matter does not result from a completed taking of the minority's shares at an unfairly low price and is not governed by a statute granting interest as compensation for the underpayment.

Plaintiffs also cite *Musto v. Vidas*, 333 N.J. Super. 52, 754 A.2d 586 (2000), as supportive of their prejudgment interest claim. In that case, the New Jersey Superior Court had previously affirmed a trial court finding that the plaintiff minority shareholder had been unfairly oppressed. *Musto v. Vidas*, 281 N.J. Super. 548, 557-58, 658 A.2d 1305, 1310 (1995). In addressing the prejudgment interest issue, the court merely deferred to the discretion of the trial court in its award of interest to the plaintiff minority shareholder and further noted that much of the delay in resolving the terms of purchase was attributable

to the defendants' interlocutory appeal from the order requiring them to buy the plaintiff's shares. *Musto*, 333 N.J. Super. at 73-74, 754 A.2d at 598. Since the trial court in the case at bar rejected the plaintiffs' claims of oppression and did not assign any larger portion of responsibility for the duration of the litigation to the defendants, we believe that the factual background of *Musto* is sufficiently distinct to deprive it of any persuasive weight here.

In *In re Seagroatt Floral Co.*, 167 A.D.2d 586, 563 N.Y.S.2d 539 (1985), the minority shareholders were awarded interest on the price paid to them by the purchasing corporation, but they objected to the interest rate used and to the extended time period granted to the corporation to make full payment. Without detailed discussion, the court affirmed the trial court, holding that an abuse of discretion by the trial court in issuing the interest award had not been demonstrated. 167 A.D.2d at 589, 563 N.Y.S.2d at 542. Since the *Seagroatt Floral Co.* court was not asked to reverse a denial of a prejudgment interest award, we believe its result offers no guidance for our disposition of the instant case.

One case cited by the plaintiffs, *Blake v. Blake Agency, Inc.*, 107 A.D.2d 139, 486 N.Y.S.2d 341 (1985), did result in a reversal of a trial court's failure to award prejudgment interest in a shareholder buyout. But the *Blake* court's entire analysis of the issue consists of the conclusory assertion that "justice requires" payment of interest under the New York statute under review unless the minority shareholder has somehow acted in bad faith. 107 A.D.2d at 150, 486 N.Y.S.2d at 350. Were *Blake* a statement of Illinois law by our supreme court, that conclusion would be sufficient to direct our determination here, but we do not find the *Blake* court's result, without more, to be a persuasive statement of a rationale for an award to the plaintiffs in the instant case.

The plaintiffs offer extensive argument regarding their view of the equitable grounds for an award of prejudgment interest, emphasizing the alleged inadequacy of the majority's offer for their shares, the duration of the litigation and the amount of interest earned by the corporation and denied to them while the purchase of their shares remained unexecuted, and the financial benefits of CMC ownership denied to them during the litigation. Plaintiffs also make policy arguments in support of their position, claiming that, in general, minority shareholders in closely held corporations have fewer resources than the majorities from whom they seek relief, and that prejudgment interest awards will discourage majorities from bad-faith bargaining, dilatory litigation tactics, and other attempts to take advantage of the resource disparity in their favor.

▮ In our view, the arguments asserted by the plaintiffs do not establish the trial court's denial of prejudgment interest as an abuse of discretion. The trial court heard evidence of the ownership benefits denied to the plaintiffs during the course of litigation, but also heard that the plaintiff shareholders were paid dividends for the years 1998 and 1999, and that several members of the plaintiff group also received severance payments in lieu of two years of future salary at the time they left the corporation. The trial court also noted that, while the plaintiffs claimed that the defendants' offered purchase price was a bad-faith, "lowball" offer, the court considered the plaintiffs' "immovable demand" to have been "highballed," and declined to assign to the defendants sole responsibility for the length of time required to finalize a valuation for the plaintiffs' shares. These findings, combined with the finding that the value of plaintiffs' shares was not a liquidated or easily ascertained amount prior to the court's valuation decision, contradict one of the basic premises of the plaintiffs' equitable argument for interest: that during the course of the litigation, the defendants were withholding funds which the plaintiffs were entitled to. The plaintiffs have thus failed to establish that the generally recognized basis for an award of prejudgment interest, the need to grant an award to make a deprived plaintiff whole (*In re Estate of Wernick*, 127 Ill. 2d 61, 86-87 (1989)), is applicable to their claim.

A court abuses its discretion when it acts arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeds the bounds of reason and judgment and ignores recognized principles of law. *Kaden v. Pucinski*, 263 Ill. App. 3d 611, 615 (1994). Given its reasoned consideration of the interest issue and the presence of substantial evidence which supports its resolution of the matter, we do not believe that the trial court's prejudgment interest ruling can be described in such terms.

## II. Plaintiffs' Claims For Postjudgment Interest

We next address the plaintiffs' claims for postjudgment interest. In contrast to its lengthy consideration of evidence relevant to the arguments raised by plaintiffs as equitable bases for an award of prejudgment interest, the court devoted only minimal attention to the postjudgment interest question. In both its *sua sponte* discussion of the issue in the initial postjudgment hearing on the payment process and in its denial of the plaintiffs' motion for reconsideration, the court addressed the postjudgment interest issue summarily, and as a matter to be presumptively resolved on the same terms as its resolution of the prejudgment interest issue. As previously recited, the court first addressed the interest issue without prompting from the parties, ruled

that the defendants would not be ordered to add prejudgment interest to the purchase price unless they were not diligent in making payment, and then, when asked to confirm the scope of that ruling, conclusively linked the two: "I mean postjudgment interest and prejudgment interest." On motion for reconsideration, the court again focused on the prejudgment interest issue, and refused an award because the amount due the plaintiffs had not been ascertainable before judgment. The court referred to the plaintiffs' motion for reconsideration as having been addressed in its entirety; then, when reminded of the request for postjudgment interest as well, merely commented, "I don't think you're entitled to anything at all."

In general, Illinois law provides for the accrual of interest after judgment in such cases to compensate the judgment creditor for the use of his money. 735 ILCS 5/2—1303 (West 1996). However, judgments arising from proceedings under the Act, and from chancery proceedings in general, are not subject to the automatic statutory accrual of postjudgment interest as are those arising from actions at law; these awards, like awards of prejudgment interest, are left to the discretion of the trial judge. (*Hadley Gear Manufacturing Co. v. Zmigrocki*, 152 Ill. App. 3d 358, 359-60 (1986).

In denying the plaintiffs' claims for prejudgment interest, the trial court gave dispositive weight to the fact that the amount they were to receive was unliquidated and difficult to ascertain prior to the valuation order. The court then offered no analysis or explanation of the basis for its decision to ignore the factual distinction presented by the liquidated nature of the plaintiffs' claim in the postjudgment context.

The defendants offer minimal argument that would support the characterization of the postjudgment interest ruling as a proper exercise of discretionary judgment. In the proposed findings of fact and conclusions of law it presented to the trial court, CMC advocated a contrary position: that a postjudgment interest award was proper, while a prejudgment interest award was not. "In cases involving the purchase of stock at fair value from minority shareholders after a statutory election by the corporation to make the purchase, interest is awarded from the date of the judgment determining the fair value of the shares, and not from the valuation date." (CMC's proposed findings of fact and conclusions of law, paragraph 71, citing *Taxy v. Worden*, 181 Ill. App. 3d 97, 105-06 (1989), and *Kalabogias v. Georgou*, 254 Ill. App. 3d 740, 751 (1993).)

In this court, CMC points out that it attempted to make payment within three days of the judgment, and that it was without fault in the drift of the payment date to nine days after the valuation ruling. The trial court's commentary supports this characterization of the

company's conduct in making payment following the valuation order: it noted the absence of any delaying tactics by the company. However, interest awards are intended, not to penalize the debtor, but rather to make the creditor whole for the lost use of his money. *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 148 Ill. 2d 348, 406 (1992). In the instant case, the court's order gave the defendants 90 days to comply, but each day that passed without payment was a day during which the plaintiffs did not receive the liquidated payment price for their shares and the defendants earned interest on that sum. In light of the identified purpose of interest awards, we believe that the debtor's lack of fault in any payment delay is, by itself, insufficient to negate the propriety of a postjudgment interest award to compensate the judgment creditor for the use of his funds. While we believe that the trial court, in the exercise of its discretion, could have determined that other factors outweighed the general premise favoring compensation for the use of a judgment creditor's funds following the liquidation of a debt, the record before us does not reveal the existence of any such factors or the trial court's reliance upon them.

In summary, the trial court, having found the unliquidated nature of the company's debt to be dispositive of the prejudgment interest issue, departed from that approach in deciding the postjudgment interest issue in spite of the company's apparent concession that postjudgment interest was appropriate. Since the record does not reveal the basis for this departure, we cannot view the denial of postjudgment interest as a proper exercise of its discretion. Accordingly, we reverse that ruling, and remand to the trial court for further consideration of the postjudgment interest issue.

### III. Dismissal of Plaintiffs' Breach of Fiduciary Duty Claims

■ The plaintiffs also contend that the trial court erred in dismissing count III of their complaint, which contained their allegations of breaches of fiduciary duty. As previously noted, the trial court initially ruled that proceedings relating to that claim would be stayed pending resolution of the valuation question, and on a number of occasions it reiterated that view in the course of rulings which purported to exclude evidence which did not relate to the valuation issue.

Those rulings did not prevent adjudication of the factual allegations underlying the plaintiffs' breach of fiduciary duty claims, however. The Act required the trial court to determine the fair value of the plaintiffs' shares "taking into account any impact on the value of the shares resulting from the actions giving rise to a petition under this Section." 805 ILCS 5/12.56(e)(i) (West 1996). The court was thus obliged to consider the statutory allegations of oppression and waste

that formed the basis for the first two counts of the complaint. This obligation was fulfilled. For example, the plaintiffs alleged that the majority shareholders and the director defendants promoted the interests of the majority family members in employment decisions, but the court found that "[a]ll of the Jahns of a given generation were evidently treated equally in terms of benefits," and that "the actions Mr. Kinderman initially took regarding the compensation and responsibilities of [plaintiffs] appears consistent with his treatment of other Jahns who were working in the business at the time." The plaintiffs alleged that a member of the majority was allowed to direct CMC to purchase a subsidiary, ASP, that the corporation allowed him to run that subsidiary without broader corporate approval, and that CMC then allowed him to purchase the subsidiary on terms that were favorable to the individual and disadvantageous to the parent company. But the court observed that a member of the plaintiff minority group was on the acquisitions committee of parent CMC at the time of the purchase of the ASP subsidiary, that in spite of their explanations, the plaintiffs' after-the-fact claims of objection to the transaction were not credible, and that the price paid for ASP by the majority family member was probably fair. The plaintiffs further alleged that the majority declined to sell another subsidiary, CRESCO, to one of the minority family members and that his offer would have been more lucrative to the parent CMC than the offer ultimately accepted. But the trial court found that the minority family member's offer for the subsidiary was not unequivocal, and that the evidence supported the company's determination that the more profitable course of action was to accept a third-party offer while retaining the more valuable portions of the CRESCO business.

Ultimately, the trial court found nothing culpable in the actions alleged by the plaintiffs to be oppressive and wasteful, remarking that "most" of the claims of waste "clearly fall within the category of business decisions." The court elaborated: "The evidence demonstrates that until outside management was recruited, the Plaintiffs were treated in a substantially equal manner with regard to benefits, both as employees and shareholders. The most remarkable changes took place after Mr. Kinderman arrived and took precisely the kind of management actions that Plaintiffs historically urged, however to a conclusion different from that which they had expected. Whatever the lacks or missteps attributed to the majority, the bottom-line is that the business was and continues to be profitable and growing."

The trial court thus found that the actions alleged to constitute oppression and waste were instead the products of business judgment, and were not motivated by a desire to profit at the company's expense

or to disadvantage the plaintiffs. Because of the structure of the plaintiffs' complaint, we believe that these findings are dispositive of the plaintiffs' breach of fiduciary duty claims. The complaint makes a single series of allegations of wrongful acts committed by the defendants; those allegations were completely incorporated by reference in each of three counts which asserted distinct theories of recovery. Count I alleged that the alleged wrongful acts constituted "oppression" and "freeze-out"; count II alleged that the same acts constituted "corporate waste"; and count III alleged that those acts constituted breaches of fiduciary duty. There is thus no factual distinction between the actions reviewed and found blameless under the first two counts of the complaint and the actions alleged to provide a basis for the breach of fiduciary duty claim.

Citing *Ballweg v. City of Springfield*, 114 Ill. 2d 107 (1986), the plaintiffs argue that the trial court's factual findings on the allegations of counts I and II do not operate to preclude their further litigation on those facts because the judgment remains subject to appellate review. While we agree with this assertion, we believe that the plaintiffs' reliance thereon is misplaced. Though they are not precluded from contesting the propriety of the trial court's ruling, the plaintiffs still bear the burden of demonstrating that the ruling was erroneous, and no such demonstration has been made. The plaintiffs make no argument which illustrates the trial court's error in determining that the defendants' various actions were innocently motivated business decisions. Nor do they indicate any rationale for a finding that innocently motivated business decisions can nevertheless constitute breaches of the fiduciary's duties of good faith, loyalty and care. *Lewis v. Playboy Enterprises, Inc.*, 279 Ill. App. 3d 47, 57-58 (1996). We accordingly affirm the trial court's dismissal of count III of the plaintiffs' complaint.

### IV. CMC's Cross-Appeal—Discount for Lack of Marketability

■ In its cross-appeal, CMC asserts that the trial court erred in failing to consider that an agreement between all shareholders severely restricted the minority owners' ability to sell their shares, and thus improperly failed to apply a discount for lack of marketability in valuing the minority interest. We disagree.

CMC, claiming that review of the trial court's ruling on this issue should be conducted on a *de novo* basis, cites *Independence Tube Corp. v. Levine*, 179 Ill. App. 3d 911, 917 (1988), for the proposition that "the trial court must consider any factor which bears on the stock's intrinsic worth" and argues that the court had no discretion to decline to apply a discount for lack of marketability. This argument is entirely

meritless. The quoted sentence fragment follows the court's discussion of the treatment of minority and marketability discounts by other jurisdictions; finding three such cases "persuasive," the *Independence Tube* court paraphrased their cautionary language: *"These cases caution, however*, that the trial court must consider any factor which bears on the stock's intrinsic worth." (Emphasis added.) 179 Ill. App. 3d at 917. Since the quoted sentence is explicitly a paraphrase of cautionary notes from other jurisdictions, its citation as a statement of black-letter Illinois law is unsupportable. The fallacy of the claim that the quoted provision deprived the trial court of the discretion to choose the appropriate valuation factors is further demonstrated by the sentences immediately following the quote: "Thus *it may be appropriate* for the trial court to consider a minority interest factor or a lack of marketability factor. *There may be* situations in which the minority or the illiquid nature of the stock diminishes its value. *In such instances*, these factors should be considered in determining fair value." (Emphasis added.) 179 Ill. App. 3d at 917.

In *Stanton v. Republic Bank of South Chicago*, 144 Ill. 2d 472 (1991), our supreme court affirmed the trial court's assessment of minority and illiquidity discounts of 5% each, but in reviewing a dispute over the percentage used, noted that the application of a discount was a matter for the discretion of the trial court, and that the court "was not even required to apply any discounts." 144 Ill. 2d at 480. We believe that Illinois law firmly establishes that the discount advocated by CMC in the instant case was a matter for the trial court's discretion. We also believe that no abuse of that discretion has been demonstrated.

The evidence presented in the case at bar indicates that CMC's shareholders received value from their ownership interests in the form of substantial dividends and lucrative employment with the company; we are aware of no evidence of any ownership value traditionally derived from sale of the stock to third parties. In our view, the substantial value resulting from the income generated by CMC ownership may not have been augmented by an external market for the shares, but that value was not reduced by the lack of third-party demand for them. In contrast, in *Independence Tube* and *Blake v. Blake Agency, Inc.*, 107 A.D.2d 139, 486 N.Y.S.2d 341 (1985), where lack of marketability discounts were upheld, the courts noted that the subject companies "had paid only modest dividends" (*Independence Tube*, 179 Ill. App. 3d at 916-17) or "had never declared or paid any dividends" (*Blake*, 107 A.D.2d at 141, 486 N.Y.S.2d at 344).

CMC cites various cases from other jurisdictions as persuasive support for the application of lack of marketability discounts in

corporate buyouts. These citations ignore the more prevalent current trend toward rejection of such discounts because they fail to fully credit the minority owner's percentage stake in the value of the enterprise in its entirety. See *Swope v. Siegel-Robert, Inc.*, 243 F.3d 486, 491-92 (8th Cir. 2001); *Arnaud v. Stockgrowers State Bank of Ashland*, 268 Kan. 163, 165-66, 992 P.2d 216, 218-19 (1999); *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137 (Del. 1989); C. Murdock, *Squeeze-outs, Freeze-outs, and Discounts: Why Is Illinois in the Minority in Protecting Shareholder Interests?*, 35 Loy. U. Chi. L.J. 737, 760-62 (2004).

In summary, we find that the facts presented in the instant case support the trial court's exercise of its discretion in refusing to apply a discount to the price of the plaintiffs' shares due to their lack of marketability.

## CONCLUSION

We affirm the judgments of the circuit court of Cook County denying the plaintiffs an award of prejudgment interest, dismissing count III of their complaint, and declining to apply a discount to the purchase price of plaintiffs' shares because of their lack of marketability. We reverse the court's denial of an award of postjudgment interest and remand the cause to that court for further proceedings on that issue.

Affirmed in part and reversed in part and remanded.

O'MALLEY, P.J., and McBRIDE, J., concur.